# EXHIBIT 3

| DENVER DISTRICT COURT, STATE OF COLORADO<br>1437 Bannock Street<br>Denver, Colorado 80202<br>720-865-8301 | DATE FILED: June 29, 2017 12:32 PM<br>FILING ID: 5A3363B3C45B5<br>CASE NUMBER: 2017CV32369 |
|---|---|
| **Plaintiff:** Brianna Leigh Bell<br><br>vs<br><br>**Defendant:** Sorin CRM USA, Inc. | ▲ COURT USE ONLY ▲ |
| **Attorneys for Plaintiff:**<br>**Name:** Patrick D. Tooley, 15273<br>**Address:** DILL DILL CARR STONBRAKER & HUTCHINGS, PC<br>455 Sherman Street, Suite 300<br>Denver, Colorado 80203<br>**Phone No.:** 303-777-3737<br>**Fax No.:** 303-777-3823<br>**E-mail:** pdtooley@dillanddill.com | Case Number:<br><br>Courtroom: |
| **COMPLAINT AND JURY DEMAND** | |

By and through counsel, Plaintiff, Brianna Leigh Bell ("Plaintiff" or "Ms. Bell"), for her Complaint against Defendant, Sorin CRM USA, Inc. ("Sorin" or the "Company"), states and alleges as follows:

## **INTRODUCTION**

1. Plaintiff worked for three years as an independent sales representative ("ISR") marketing cardiac rhythm management ("CRM") devices for Defendant. She entered into a three-year ISR agreement ("Contract") with Defendant in May 2014, which on its terms was to renew on a year-to year basis after the initial term, but which Defendant terminated at the end of

the initial term. In this Complaint, Plaintiff seeks compensation for Sorin's breach of the Contract, and (in the alternative) for harms she has suffered as a result of Sorin's false representations during negotiation of the Contract about the Company's access to the non-exclusive accounts that constituted her contractual "territory." Additionally, she seeks compensation for the Company's false representations during negotiation of the Contract about the Food and Drug Administration ("FDA") regulatory status of technologically advanced Sorin CRM products that supposedly would soon be available for her to market. She asserts claims for fraud in the inducement and promissory estoppel. In the alternative she claims breach of contract.

## PARTIES

2. Plaintiff is, and at all times relevant to this Complaint was, a resident of California. From or about May 5, 2014 through or about May 1, 2017 Plaintiff worked as an ISR for Sorin in Southern California.

3. Defendant Sorin CRM USA, Inc. is a Delaware Corporation, with its principal office located in Arvada, Colorado.

4. Many if not all of the officers of Sorin are officed in Arvada, Colorado.

5. Sorin's parent company is LivaNova PLC, which was formed by the merger of Sorin SpA. and Cyberonics, Inc. Sorin CRM USA, Inc. was a subsidiary of Sorin SpA. before the merger and is now a subsidiary of LivaNova PLC.

## JURISDICTION, VENUE, AND CHOICE OF LAW

6. Jurisdiction and venue lie with this Court pursuant to the terms of the Contract, which provides that any litigation between the parties will be maintained in Denver, Colorado.

7. Pursuant to the Contract, the parties have chosen Delaware law to apply to all issues arising from the Contract.

## FACTUAL BACKGROUND

8. Since 2004, Plaintiff has worked as a sales representative for companies that manufacture CRM devices, which are implanted in patients who suffer from certain heart conditions. From 2004 to 2008 she worked as a direct employee representative for St. Jude Medical ("St. Jude," now part of Abbott Labs), and from 2008 to 2014 she worked as a representative for Medtronic, Inc. ("Medtronic"), also as a direct employee. At St. Jude and Medtronic she received a regular salary as well as other compensation, held significant sales leadership positions, and was responsible for developing a significant share of the CRM device market in the Los Angeles Metropolitan area.

9. Working as a CRM device sales representative involves far more than simply selling the devices. Representatives also assist in the operating room when devices are implanted, and they provide advice both before and after surgery to help assure the selection of appropriate devices and the optimal function of devices once they are implanted.

10. Representatives thus establish ongoing relationships with physicians and medical practices based on the special knowledge and skills they contribute. During the course of her career in the CRM device field, Plaintiff has developed an outstanding reputation for the kind of service she provides. She is well known for her empathy with patients, her unrivaled knowledge of CRM products, and her integrity.

11. Over the span of her thirteen-year career in the CRM device field, Plaintiff has developed excellent professional relationships with numerous physicians in the Los Angeles Metropolitan area. Before she joined Sorin, physicians in her extensive network regularly used her services and the devices offered by her employer company.

12. On or about May 5, 2014 Plaintiff entered into the Contract with Sorin CRM USA, Inc. based on representations made to her by management employees of the Company, in particular Aamir Mahmood ("Mahmood," then Sorin's Regional Vice President for the region that includes Plaintiff's Los Angeles sales territory) and Stefano DiLullo ("DiLullo," then President for Cardiac Rhythm Management at Sorin SpA.). As a result of those representations, as set forth in further detail below, Bell expected and understood that her new position would mean an opportunity to sell cutting edge new technology (both evolutionary and revolutionary) to physicians and institutions with which she had worked while employed at St. Jude and Medtronic, and a big increase in her income. All of her interaction with Sorin prior to execution of the Contract was with Mahmood during April 2014, except that she also met once in France in April 2014 with DiLullo, who reinforced what Mahmood had told her about the technology available for her to market.

13. Plaintiff received a draft of the Contract from Mahmood on or about April 11, 2014, and negotiations about specific terms continued through May 5, 2014, when Plaintiff was induced to sign the Contract and began working for Defendant.

**A. Access to Hospitals in Territory**

14. Schedule 3.01 in the Contract assigned non-exclusive accounts to Plaintiff as her marketing territory. As described above all these accounts were all accounts with which she had

worked prior to entering into the Contract during her employment with St. Jude's and/or Medtronic.

15. Plaintiff herself prepared the list in Schedule 3.01 and asked Mahmood pointed questions about whether Sorin products could be implanted at the hospitals to be assigned to her as accounts once she agreed to join Sorin (i.e., whether the Company had "access" to those hospitals, as that term is described below).

16. Plaintiff insisted that Schedule 3.01 be attached as an addendum to the Contract and expressly referred to therein. Mahmood initially informed her that Sorin would not agree to attach this addendum and expressly incorporate it into the terms of the Contract, as such contract structure and terms had never before been used by the Company in its ISR agreements. Plaintiff, however, *insisted* that this schedule be expressly referenced in the Contract and attached thereto. She explained to Mahmood that access to the listed entities was a material term (indeed, perhaps the most important material term) for her, and that without such a contractual commitment she would not accept Sorin's ISR offer.

17. Defendant ultimately agreed to have Schedule 3.01 attached as an addendum to the Contract, and to have the Contract language explicitly refer to it.

18. Whether or not Sorin products could be implanted at a given hospital depended on whether the Company had an existing contractual relationship with the hospital or the system of which the hospital was a part. In some cases group purchasing organizations ("GPOs") or independent delivery networks ("IDNs") also were involved, and in some cases, even if Sorin was "on contract" with a hospital system (sometimes referred to as being on contract at the corporate level), local approval from each hospital was required for the Company's products to

5

be implanted. The ability to market CRM devices for implantation at a hospital is often referred to as having "access" to the hospital.

19. To the extent an individual hospital was part of an IDN or GPO, Sorin was in most if not all cases required to have executed a contract with the IDN or GPO in order to have "access" to any individual hospital that was part of the IDN or GPO.

20. For an ISR like Plaintiff, access is critical to both marketing and actually making sales. No access means no sales, but obtaining access was unequivocally Sorin's responsibility, whether at the corporate or GPO/IDN level, or with any individual hospital at the local level.

21. Plaintiff had no way to obtain access to the entities listed on Schedule 3.01 if Defendant had not or did not do so. The terms of the Contract made it explicit that she was "not to be considered an agent or employee of the Company for any purpose. In no event shall [Ms. Bell] have authority to bind or commit the Company to any agreement whatsoever . . . without express written authorization." Therefore, Mahmood's representations about Sorin "having access" to the entities listed in Schedule 3.01 was absolutely critical in inducing Plaintiff to join Sorin as an ISR.

22. From or about April 11 2014 through or about May 5, 2014, Plaintiff met with Mahmood in person on at least two occasions, including one occasion in which Mahmood flew to Los Angeles and met with Plaintiff at the Peninsula Restaurant in Beverly Hills. During this meeting, Plaintiff asked pointed questions about Sorin's access to all of the entities listed in Schedule 3.01, and Mahmood assured her that this access was in place and that there were no obstacles to her beginning immediately to market and sell Sorin products to her well-developed physician network.

23. Plaintiff also either spoke to Mahmood by phone or engaged in text messaging with him *at least twenty times* in that same time frame, again specifically going through the entities that ultimately were memorialized and listed in Schedule 3.01 to ensure that Sorin was "on contract" and Plaintiff would have the access required to market and sell Sorin products. During the course of these negotiations she specifically listed the hospitals, physicians, and medical practices that comprised her sales territory with Medtronic and/or St. Jude, and made an explicit point of asking whether she would have access to the hospitals in that territory if she joined Sorin. In response, Mahmood consistently assured her that this access was in place for Sorin.

24. Plaintiff posed these questions in increasing detail directly to Mahmood, over the course of many discussions (in person, on the telephone, and via text messages) during the two-week time period before she executed the Contract. Every question was *directly* related to the entities listed in Schedule 3.01, and each time a question on access was raised Plaintiff received assurances that Sorin had access to these hospitals, and that all necessary contracts with hospitals, hospital groups, GPOs, IDNs and the like were in place. She was explicitly told that there was no issue impeding her from marketing to her vast physician referral network, or impeding the physicians in that network from *immediately* purchasing and implanting Sorin devices at the hospitals listed in Schedule 3.01.

25. Dr. John P. McKenzie III ("McKenzie"), a prominent Los Angeles Metropolitan area electrophysiologist, has been one of Plaintiff's biggest sources of business for more than ten years. Before entering into the Contract Plaintiff wanted to be sure Sorin could provide McKenzie with the hospital access he required if he elected to continue working with her after

she became a Sorin sales representative. He had committed to such continuation, but only if it would not disrupt his practice.

26. Thus McKenzie made direct inquiries to Mahmood about how Plaintiff's switch to Sorin would affect his practice and the practices of other doctors with whom he works, should he and these physicians choose to continue working with Plaintiff and implant Sorin devices. McKenzie was assured by Mahmood that if Plaintiff joined Sorin, he could continue to rely on her and the Company she would then represent. He was told there would be no issue regarding hospital access and that Sorin was "on contract" with every hospital at which he had privileges to perform implant surgeries. McKenzie informed Plaintiff of what he had been told by Mahmood. Upon information and belief, Mahmood made those representations knowing they were not true in an effort to induce Plaintiff to enter into the Contract.

27. Although Plaintiff was told repeatedly and in great detail by Mahmood that Sorin had access to all of the hospitals listed in Schedule 3.01, after she signed the Contract she learned such access was in most cases limited or non-existent.

28. Because of the lack of access, during her three years as an ISR for Sorin, Plaintiff made no sales at all at most of the listed hospitals, and at the others came nowhere close to her sales while she worked for Medtronic and St. Jude.

29. Shortly after Plaintiff signed the Contract and began working with the Company, McKenzie scheduled several patients to refer to her for her assistance in implanting Sorin devices. On the first day of Sorin cases, however, he experienced a complete disruption of his schedule because Sorin was not in fact officially on contract anywhere where he was privileged.

30. Over the course of her relationship with Sorin, Plaintiff continued to encounter problems similar to McKenzie's "first day" problems, both for him and for other physicians.

B. **Regulatory Status of Promised Technology**

31. In addition to promises about access, prior to Plaintiff entering into the Contract, Mahmood assured Plaintiff that new technology from Sorin would soon be available to market in the United States and that the only impediment was FDA approval.

32. Prior to entering into the Contract, Plaintiff received assurances from both Mahmood and DiLullo that certain devices, including the Kora MRI-compatible pacemaker platform ("Kora"), which was successfully being marketed in Europe, had been submitted for FDA approval.

33. In fact, Plaintiff later learned that Kora had not been submitted to the FDA.

C. **Access As A Term of the Contract**

34. Because access is so essential for an ISR to market CRM products successfully, the territory defined by Schedule 3.01 to the Contract would be meaningless and of no value to Plaintiff if Defendant did not have access to the listed hospitals for the implantation of the kind of CRM devices marketed for Sorin.

35. Plaintiff reasonably understood that Defendant was promising it had access to the hospitals listed in Schedule 3.01, and indeed insisted that this Schedule be attached to and referred to in the Contract to illustrate how this was a material term for her and to make this promise enforceable.

36. Although the Contract is silent on the issue of access, the fact that it both contains Schedule 3.01 and explicitly prohibits Plaintiff from making any agreement on behalf of the Company means that the only rational interpretation of the Contract language is that Sorin was promising access to the hospitals listed in Schedule 3.01.

37. Any other interpretation of the Contract would produce an absurd result, contrary to the terms that any reasonable ISR would ever have accepted.

## LEGAL CLAIMS

### First Claim for Relief
### (Fraud in the Inducement)

38. Plaintiff hereby incorporates all statements and allegations set forth above in Paragraphs 1 through 33.

39. As alleged above, Sorin falsely represented, concealed relevant facts, and failed to disclose information (a) about access to the accounts that were to constitute Plaintiff's territory, and (b) about the regulatory status of certain Sorin technology.

40. The Company was fully aware that it was providing Plaintiff with false information about access and whether technology had been submitted to the FDA for approval, that it was concealing the truth from her, and that it was withholding information relevant to the terms and conditions of the Contract.

41. The Company intended for Plaintiff to rely on the misinformation it provided to her about access and submission to the FDA, whether through misrepresentation, concealment, or nondisclosure, in reaching her decision about whether or not to enter into the Contract.

42. Plaintiff justifiably relied on the false and misleading information, which was material information, provided to her by Sorin in reaching her decision to accept the Contract offer.

43. Defendant sought to induce Plaintiff to accept the Contract because it wanted to expand its sales by however much it could for the accounts she had developed, and was willing to accept loss of many of those accounts in order to gain some new customers for the few accounts where its access and technology would suffice.

44. As a result of the Company's fraudulent inducement, Plaintiff has suffered loss of income, reputational harm, and limitations on her ability to work in the CRM field going forward in an amount to be proven at trial.

### Second Claim for Relief
### (Promissory Estoppel)

45. Plaintiff hereby incorporates all statements and allegations set forth above, except for Paragraphs 34 through 37.

46. Sorin made false promises to Plaintiff about access to the accounts included in her Territory and the technology submitted to the FDA for approval.

47. The Company's promises were made with knowledge they were false and with the reasonable expectation that based on them Plaintiff would enter into the Contract.

48. Plaintiff reasonably relied on the promises in accepting Sorin's offer to work for the Company as an ISR.

49. It would be manifestly unjust not to compensate Plaintiff for her reliance on the false promises made to her by Sorin.

50. As a result of Sorin's false promises, Plaintiff has suffered loss of income, reputational harm, and limitations on her ability to work in the CRM field going forward. Her damages come to well in excess of $75,000.00.

**Alternative Third Claim for Relief**
**(Breach of Contract)**

51. Plaintiff hereby incorporates all statements and allegations set forth above, except for Paragraphs 38 through 50.

52. On or about May 5, 2014 Plaintiff and Defendant entered into the Contract, a material term of which was access to the hospitals listed in Schedule 3.01 to the Contract. Plaintiff fully performed under the Contract.

53. Although Defendant promised such access, Defendant did not have and did not provide access to the hospitals listed in Schedule 3.01 as it had agreed to do. As a result, Defendant materially breached the Contract.

54. Plaintiff has suffered harm as a result of Defendant's breach.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that the Court award the following types of relief:

1. Judgment against Defendants, in an amount to be determined at trial, together with an award of reasonable attorney fees and costs, interest, and such further relief as Plaintiff may request or which the Court deem just and equitable.

2. Notice as to Punitive Damages: Plaintiff reserves the right to amend her Complaint to seek punitive damages as permitted by Colorado statutory law.

**JURY DEMAND**

Plaintiff demands trial by jury on all issues triable of right by jury.

Dated: June 29, 2017

        **DILL DILL CARR STONBRAKER
        & HUTCHINGS, P.C.**

        Patrick D. Tooley
        Patrick D. Tooley, #15273
        455 Sherman Street, Ste 300
        Denver, CO 80203
        and
        Lawrence P. Schaefer, MN Atty ID #195583
        (pro hac vice admission to be applied for)
        Bert Black, MN Atty ID #345052
        (pro hac vice admission to be applied for)
        SCHAEFER HALLEEN, LLC
        412 South Fourth Street, Suite 1050
        Minneapolis, MN 55415
        Tel. 612.294.2600
        Fax. 612.294.2640
        lschaefer@schaeferhalleen.com
        bblack@schaeferhalleen.com
        ***Attorneys for Plaintiff***

Plaintiff's Address:
8500 Burton Way, Suite 615
Los Angeles, CA 90048